1                    IN THE UNITED STATES DISTRICT COURT

2                       FOR THE DISTRICT OF MARYLAND

3                            SOUTHERN DIVISION

4    UNITED STATES OF AMERICA,      ) CRIMINAL
                                    ) NO. PJM-21-502
5              Plaintiff,           )
                                    )
6    v.                             )
                                    )
7    DE AUNDRE TYRIQUE KEYS,        )
                                    )
8              Defendant.           )

9               TRANSCRIPT OF SENTENCING PROCEEDINGS
                BEFORE THE HONORABLE PETER J. MESSITTE
10                  UNITED STATES DISTRICT JUDGE
                WEDNESDAY, JANUARY 18, 2023; 2:39 P.M.
11                      GREENBELT, MARYLAND
     APPEARANCES:
12
     FOR THE PLAINTIFF:
13
                 OFFICE OF THE UNITED STATES ATTORNEY
14               BY:  JESSICA C. COLLINS, ESQUIRE
                 6406 Ivy Lane
15               Suite 800
                 Greenbelt, Maryland  20770
16               (301) 344-0179

17   FOR THE DEFENDANT:

18               OFFICE OF THE FEDERAL PUBLIC DEFENDER
                 BY:  AMY STEFFAN FITZGIBBONS, ESQUIRE
19               6411 Ivy Lane
                 Suite 710
20               Greenbelt, Maryland  20770
                 (301) 344-0600

21

22
     OFFICIAL COURT REPORTER:
23   Renee A. Ewing, RPR, RMR, CRR - (301) 344-3227

24        ***COMPUTER-AIDED TRANSCRIPTION OF STENOTYPE NOTES***

25

1              (Call to order of the Court.)

2              THE COURT:  Good afternoon, folks.  Have a seat,

3  please.  All right, Madam Clerk.

4              THE DEPUTY CLERK:  The matter now pending before this

5  Court is Criminal Case No. PJM -- Your Honor, just a moment.

6         I will begin again.  The matter now pending before the

7  Court is Criminal Case No. PJM-21-0502, the United States of

8  America vs. De Aundre Tyrique Keys.  The matter now comes

9  before the Court for a sentencing.

10             THE COURT:  All right.  Counsel, identify yourselves

11  first for the government and then defendant.

12             MS. COLLINS:  Good afternoon, Your Honor.  Jessica

13  Collins on behalf of the United States.  With me at counsel

14  table is DEA Task Force Officer Mark Howard, and also present

15  in the courtroom are family members of the victim in this case.

16             THE COURT:  I'm sorry.

17         (Discussion off the record.)

18             THE COURT:  Mr. Keys, can you hear me now?

19             THE DEFENDANT:  Yes, sir.

20             THE COURT:  All right.  For the defendant?

21             MS. FITZGIBBONS:  Yes.  Thank you, Your Honor.  Amy

22  Fitzgibbons, Assistant Federal Public Defender, on behalf of

23  Mr. De Aundre Keys, who is present.

24             THE COURT:  All right.  With regard to the

25  presentence report, any issues from the government or the

1  defendant?  I think the government had some, perhaps, technical

2  difference on the calculation.  Ms. Collins?

3         MS. COLLINS:  Your Honor, as I noted in our

4  memorandum, there was a difference in the calculation from the

5  plea agreement and the -- and the PSR.  It didn't ultimately

6  result in any change to the recommended -- or to the advisory

7  guidelines range, but the PSR did apply a two-level enhancement

8  for possession of a firearm which was not contemplated in the

9  plea agreement.

10        THE COURT:  Well, what -- what is your suggestion as

11  to how I register this?

12        MS. COLLINS:  So, Your Honor, I noted that in light

13  of our obligation to -- to honor our plea agreement

14  stipulations.  Again, I don't actually think the Court needs to

15  address it because it doesn't ultimately impact --

16        THE COURT:  Well, I do in the sense I have to make a

17  report.  I mean, I have to report what the numbers are.  First

18  thing I need to do is state the offense level and then the

19  criminal history.  Now, where the sentence goes is a different

20  matter.

21        MS. COLLINS:  Yes, Your Honor.  And, again, I -- I

22  don't have either a dispute with the underlying facts or with

23  the -- the legal application of that enhancement, but we are

24  obligated to comply with our plea agreement stipulations which

25  did not include that two-level enhancement.

1          THE COURT:  Ms. Fitzgibbons, what's your position on

2     that?  Are you agreeable to listing it as a criminal offense

3     level 42 or 40, what?  Because I have a criminal history

4     category of V.

5          MS. FITZGIBBONS:  Yes, Your Honor.  We take no issue

6     with the criminal history category.  Typically, we -- I have

7     seen judges adhere to what the parties agreed the guidelines

8     were in the --

9          THE COURT:  Well, shall I list it as a 40?

10          MS. FITZGIBBONS:  That would be our position, yes,

11     Your Honor, because it's consistent with what we agreed to.

12          THE COURT:  The Court will then find the offense

13     level to be 40 and the criminal history category to be a V.  So

14     -- and, again, just for purposes of the record, I know this is

15     a "c" plea, but with regard to the -- the first count in the

16     case, the guideline range is 360 months to life.  The plea

17     agreement provision is 120 to 144 months.

18          And with regard to Count Two -- the Court clerk reminds

19     me you can take your masks off when you are addressing the

20     Court if it's easier.  It's easier to hear you.  With regard to

21     Count Two, the guideline range is -- well, 360 months to life

22     is the overall range.  120 months is the guideline -- is the

23     plea agreement range.

24          Supervised release as to Count One is at least three

25     years; Count Two, one to three years; a fine range is 50,000 to

1  $100,000; and the special assessment, then, would be $100 on

2  Count One and $100 on Count Two.

3      And I gather with the plea agreement, you treat them as

4  two separate offenses.  Is that correct, Ms. Collins?

5          MS. COLLINS:  That's correct, Your Honor.

6          THE COURT:  All right.  So with those numbers in

7  mind, I will hear you on allocution, Ms. Collins, first.

8          MS. COLLINS:  Your Honor, before I begin to allocute,

9  I do have three members of the victim's family present who I

10  believe would like to address the Court.

11      Would you like me to speak first or --

12          THE COURT:  That's fine.  I don't know that they need

13  to take the stand.  They can come to the podium.  But I'd like

14  them to identify themselves by name and what their relationship

15  to the case is.

16          MS. COLLINS:  Thank you.  I believe this is the

17  victim's brother who is addressing the Court first.

18          WILLIAM WOODWARD:  Hello, Your Honor.  My name is

19  William Woodward, Billy Woodward.  Aubrey was my baby brother.

20  He was a bright light who had faced multiple hardships in his

21  life, yet maintained a sense of youthful exuberance and a

22  thirst for life.  He was an avid fan of the outdoors.  He

23  sincerely enjoyed cooking for friends and family.  Aubrey was

24  full of humor and always on the lookout for the enjoyment that

25  life could provide.

1        I love my baby brother and he loved me.  He was a

2   straight shooter, and I always admired that.  So many beautiful

3   qualities that simply shined through him were admirable.  He

4   was always quick with a joke and a smile.  He was full of charm

5   and had the uncanny ability to start a conversation with

6   absolutely anyone.  It was awe inspiring.  I always told him

7   that when he found the crossroads of personal passion that also

8   leveraged his communication skills, that the sky was going to

9   be his limit.

10       But most of all, it was his never-ending reminder that we

11  were family for better or for worse.  When times were tough and

12  relationships strained, he would toss that fact out there.

13  Love and loyalty was his motto, and he did his best to abide by

14  it.

15       Eight years separated us, yet we did our best to make up

16  for that gap.  We had our hardships and faced the distinct

17  challenges that only come from the relationship between two

18  brothers.

19       He was always a free spirit, while I was a bit more

20  grounded.  This led to turbulent points, but that turbulence

21  ultimately acted as a catalyst and a challenge for us to

22  improve upon our relationship.  We had worked hard during the

23  pandemic to mend our brotherhood, and it showed.  That is

24  something that I truly cherish, but that also hurts my heart to

25  know that we had so many special times ahead of us that in an

1   instant were destroyed.

2       He was my baby brother.  He was my only brother.  And he

3   was robbed of his life; robbed of his future; robbed of knowing

4   my son, his nephew; robbed of holding him in his arms; robbed

5   of every sunrise and sunset; robbed of easy lifes and cold

6   beers; robbed of family gatherings during holidays; robbed of

7   the freedom and life that he so enjoyed.  Aubrey was robbed.

8       I will forever carry this grief until the end of my days.

9   In fact, I have come to understand that the difficult truth

10  about grief of this nature is that it doesn't get easier.  The

11  cliches are true.  You simply learn to live with it.  As much

12  as it hurts my heart and my soul to even consider having to

13  live without Aubrey in my life, it's a fact that I must accept.

14  The cold truth is a piece of me left the day that we lost him.

15  I am forever less without my brother in the world.  And it's

16  not lost on me that this happened almost ten years to the day

17  that we lost our mother to whom he was so incredibly close.

18      Morality is something I hold dear.  I am someone who

19  truly believes in right and wrong.  What Mr. Keys did resides

20  in the darkest sense of wrong.  His actions directly led to the

21  death of another human being.  That person happened to be my

22  brother.  His actions led to the death of my brother.

23      How many others could or have been affected and could

24  have been the victim of Mr. Keys' actions?

25      Aubrey meant so much to so many, and now we are left to

1  live in the void that he's left behind.  I will miss him

2  forever.  I will love him forever.  My heart and my soul are

3  forever burdened, and I so wish this had never happened.

4      Thank you.

5          THE COURT:  Ms. Collins, anyone further?

6          MS. COLLINS:  Yes, Your Honor.  I believe next is the

7  victim's father, William Woodward.

8          THE COURT:  All right.

9          WILLIAM WOODWARD:  Your Honor, my name is William

10 Woodward.  Aubrey was my son.  Aubrey was an upbeat man, full

11 of life and vigor.  Aubrey was quick with a joke and laughter.

12 Aubrey was always good natured and had many friends.  Aubrey

13 called me every day to see how I was doing, to see if I needed

14 any help with anything.  And in the summer months, we spent

15 time fishing and crabbing.  Aubrey was instrumental in a boat

16 trailer to launch so we could go spend some time on the

17 Chesapeake Bay.

18     I have a small farm.  Aubrey was always there to help

19 with all of the work -- work and getting equipment.  Aubrey

20 helped repair the barn and cutting grass and clearing land.

21 Aubrey helped clear the flagstone patio in the backyard.

22     Aubrey always told me numerous times that he would always

23 be there whenever I needed him.  Aubrey also told me that he

24 was -- that I was getting old.  I am 75, and Aubrey assured me

25 he'd never let me be alone, and that he was concerned that I

1  would be put in a nursing home.  He said he would never let

2  that happen.  He was a very concerned and loving son.  I don't

3  feel I need to go into any kind of nursing home or anything

4  like that.  I am in good health.

5       On March 1st, 2021, Aubrey called me when I was on my way

6  to the pharmacy to receive my first COVID-19 shot.  Aubrey was

7  pleased that I was getting the shot and asked me to call him

8  afterwards and -- when I was done, and we could get together

9  and do something.  After I was done at the pharmacy, I failed

10 to call Aubrey, much to my regret.  After I was home for some

11 time, I received a call that my son had been killed by fentanyl

12 poisoning.

13      Whenever my son's name, Aubrey, is spoken, I must fight

14 back tears; let alone thinking of him, I become lost and

15 emotionally break down.  My heart is broken because of his

16 loss.

17      Thank you.

18      MS. COLLINS:  Thank you, Your Honor.

19      And, finally, the victim's sister, April Woodward.

20      THE COURT:  All right.

21      APRIL WOODWARD:  Good afternoon, Your Honor.  My name

22 is April Woodward.  Aubrey was my little brother.  His name was

23 Ralph Aubrey Woodward.  He was my best friend, my rock.

24      My little brother was drastically taken from us March

25 1st, 2021.  I have been impacted so much that I went into

1  rehabilitation in order to get off Suboxone and received mental

2  health -- health help before the year anniversary of his death.

3  I did this because I honestly didn't trust myself to properly

4  deal with the pain on that day.

5       I wake up every morning reliving the fact that my little

6  brother is gone.  I can never talk to him, hug him, or even

7  just see his smile.

8       You have no idea how important Aubrey was.  He had a huge

9  heart and helped everyone.  He could make anyone smile when

10 they were down.  He was a light worker and angel on earth.  He

11 was taken by that man's hand when he gave my brother a death

12 sentence in the form of fentanyl.  That was not his place.

13 This was done out of man's hand, not God's.  I pray every day

14 for it to be a nightmare and that my brother would run through

15 the door with a huge smile on his face asking if I am okay or

16 if I need anything.  Now I have to turn to the sky or stand at

17 his grave and speak with no words returned; no smile; no hugs;

18 no contact ever again ever.

19      This man wakes up every day.  He may be behind bars, but

20 he breathes the same air.  He gets to contact family.  My

21 brother's life, however, has been stolen by this man.  My

22 brother no longer wakes up or breathes air.  We can't see him

23 anymore because of this drug dealer.  I can't express in words

24 how much I am impacted every second of every minute to every

25 hour consumed in days and months and now almost two years.  I

1  feel lost without him.  Forever there will be a hole stolen

2  from my heart and soul because he is no longer alive.

3       Thank you, Your Honor.

4            THE COURT:  All right, Ms. Collins.

5            MS. COLLINS:  Thank you, Your Honor.

6            Consistent with the plea agreement in this case, we are

7  requesting a sentence of 144 months on Count One and 120 months

8  on Count Two, and we are asking that those sentences run

9  concurrently to one another but consecutive to any term of

10  imprisonment that has been imposed in a separate state case

11  with respect to the defendant.  And, specifically, as reflected

12  in the PSR, the defendant was sentenced for firearms offenses

13  in the Circuit Court for St. Mary's County to ten years, as

14  well as to three years and six months on a probation violation

15  for a prior CDS possession with intent to distribute

16  conviction.

17            THE COURT:  All those sentences have been imposed

18  now?  He's currently serving those sentences?

19            MS. COLLINS:  That is correct, Your Honor.  They were

20  imposed last February, and he is currently serving those

21  sentences in the custody of the State of Maryland.

22            THE COURT:  And they are all in Saint Mary's County

23  Circuit Court?

24            MS. COLLINS:  Yes, Your Honor.

25            THE COURT:  All right.

1          MS. COLLINS:  Your Honor, I will -- I want to begin

2   with the nature of the offense in this case because it is

3   unquestionably serious and I would submit among the most

4   serious type of offenses we see in this court.  The defendant

5   was engaged in the distribution of fentanyl, a notoriously

6   dangerous substance because of its strength.  It's far more

7   potent than heroin and many other opioids, such as oxycodone,

8   which makes it far more likely to result in overdoses and in

9   overdose deaths, which, unfortunately, we do see in this court.

10          And the defendant chose to put that dangerous and deadly

11   substance out into the world, and the results here were tragic.

12   The defendant sold fentanyl that was used by the victim, and as

13   a result, the victim overdosed and died.

14          And the Court has just heard from family members of the

15   victim, so I won't try to restate what they have already told

16   to the Court, but these statements do reflect the devastating

17   impact of the defendant's crime, an impact that has

18   reverberated across his family.  It's not only the immediate

19   loss of the victim, but also the ongoing loss of his love and

20   companionship and the grief and the devastating impact that

21   this has upon his family members moving forward.

22          On top of this serious offense, the defendant also chose

23   to possess a firearm and ammunition.  Following the victim's

24   death, when law enforcement executed a search warrant at the

25   defendant's apartment, they found a loaded firearm with an

1  extended magazine loaded with 21 rounds of ammunition.  They

2  also found additional rounds of ammunition and magazines and

3  more than 30 grams of a fentanyl mixture.

4       So not only did the defendant have and sell a

5  particularly dangerous drug, he also had a dangerous and deadly

6  weapon, a firearm that he was prohibited from possessing as a

7  result of his prior felony convictions.

8       Given the seriousness of the defendant's conduct and the

9  threat it posed to the community, a very substantial term of

10  imprisonment, we would submit, is appropriate here.

11       These offenses shouldn't be viewed in isolation, but

12  rather against the defendant's prior criminal history.

13  Although relatively young, the defendant had amassed a

14  significant history prior to committing these offenses.  Of

15  particular note, in 2019, he was charged with CDS possession

16  with intent to distribute a narcotic in St. Mary's County and

17  convicted of that, and he was still on probation for that

18  conviction when he committed the offenses in this case.

19       In addition, while he was on that probation in October

20  2020, he was caught with a firearm and ammunition.  That is the

21  -- the firearms conviction from last February that I just

22  mentioned and that he is serving a sentence for at this point

23  in time.

24            THE COURT:  How long has he been in custody on those

25  charges?

1          MS. COLLINS:  Your Honor, I would have to consult the

2    PSR.

3          THE COURT:  Approximately?

4          MS. COLLINS:  I believe he has been in custody since

5    March of 2021 when the search warrant happened in this case.

6          THE COURT:  But the additional -- the time that he

7    has on the state sentence adds up to what at this point?  Give

8    me the numbers that add up from --

9          MS. COLLINS:  So he was sentenced to ten years in the

10   state, in the new state conviction and then three years and six

11   months consecutive, so a total of that would be 13 years and

12   six months.

13         THE COURT:  All right.

14         MS. COLLINS:  And I believe that this was referenced

15   in the defendant's sentencing memorandum.  I believe on the

16   ten-year sentence, it is five years before he would be eligible

17   for parole in that case.

18        So, Your Honor -- but I would note after he was caught

19   with this firearm in October of 2020, it was just five months

20   later, in March of 2021, when the events in this case took

21   place where he sold the fentanyl that resulted in the victim's

22   death and also was found in possession of a new firearm and

23   ammunition.

24        Now, I would also note that both the PSR and the

25   defendant's sentencing memorandum highlighted certain

1  challenges in the defendant's background, including an early

2  history of substance abuse, and we do believe that those

3  factors are recognized in the agreed-upon range set forth in

4  the plea agreement.

5      The defense's sentencing memorandum also notes the

6  sentences that were imposed in a number of other overdose cases

7  resulting in death, and it's always difficult to compare cases

8  because of the different characteristics and facts in each

9  case, but I -- I would note that those cases did not -- I

10 reviewed them and I didn't see a reference in any of them to

11 also having possession of a firearm.  So this is certainly, I

12 think, at the more serious end of these sorts of cases in light

13 of the possession of the firearm in addition to the -- the

14 distribution offense.

15     So the Court has discretion about whether to order the

16 sentence in this case to run concurrently or consecutively or

17 partially concurrently to the defendant's state sentences, and

18 we do believe that given the exceptionally serious nature of

19 the offenses here, as well as the defendant's history and

20 particularly his criminal history leading up to these offenses,

21 that a consecutive sentence is appropriate.

22     Now, the defendant's state sentences are for unrelated

23 conduct for possessing the firearm in October of 2020 and for

24 the probation violation, and that was just months -- that --

25 excuse me -- just months after possessing that firearm in

1   October of 2020 that led to the state conviction, he was then

2   caught with an additional firearm and ammunition in this case.

3        And as reflected in the statement of facts here, the

4   defendant was not only under court supervision but was actually

5   wearing an ankle monitor when he committed the crimes in this

6   case, and even this heightened level of supervision did not

7   deter the defendant's criminal conduct.

8        So given the ongoing, repeated nature of the defendant's

9   conduct and the fact that he continued to engage in this

10  conduct even after incurring new state charges, we believe a

11  consecutive sentence is appropriate for these new, separate,

12  and extremely serious criminal offenses.

13       Finally, Your Honor, I would note that yesterday we did

14  submit a supplement requesting restitution in the amount of

15  $12,458 for funeral expenses for victim one, and that filing

16  had documentation attached to it regarding those expenses.

17            THE COURT:  Have you seen that, Ms. Fitzgibbons?

18            MS. FITZGIBBONS:  I have, Your Honor.

19            THE COURT:  Are you going to have any issue with

20  that?

21            MS. FITZGIBBONS:  No, Your Honor.  I would just ask

22  that the government, consistent with the plea agreement,

23  recommend that the assets that were seized be applied to the

24  restitution.  There were -- there was a significant amount of

25  money that was seized that can be applied towards the

1   restitution immediately.

2          THE COURT:  What's the government's position on that,

3   Ms. Collins?

4          MS. COLLINS:  Your Honor, as I am sure the Court

5   knows, pursuant to the regulations, we can recommend that.

6   That is not ultimately within the discretion of our office, but

7   it is a recommendation that we make to the -- the money

8   laundering unit within the Department of Justice and --

9          THE COURT:  Well, the Court, in ordering payments to

10  be made, can order restitution immediate insofar as assets are

11  available, and then there would be the order of further cash

12  restitution.  I assume there are -- there are -- well, further

13  cash restitution is out of earnings, for example, from working

14  in custody, so I would have to make a decision about that.  I

15  wouldn't have a problem doing that.  And then insofar as -- I

16  don't know whether it's the Bureau of Prisons who decides --

17  it's the U.S. Attorney, isn't it, who decides what assets get

18  applied to what?

19         MS. COLLINS:  So, Your Honor, with respect to assets

20  that were seized and then forfeited, it is something where our

21  office makes a recommendation to the money laundering unit, and

22  they ultimately make the determination.  Generally speaking,

23  with a defendant such as Mr. Keys where he doesn't have other

24  assets, I expect that that would occur, but I can't make a

25  commitment because it's simply, under the regulations, not

1  within our office's --

2          THE COURT:  Well, I can make an order.  I mean --

3          MS. COLLINS:  Yes, Your Honor.

4          THE COURT:  Okay.  Understood.  Is there a separate

5  restitution order, though, anywhere proposed?

6          MS. COLLINS:  Your Honor, I believe that -- I did not

7  propose a separate restitution order.  I believe that's usually

8  within the judgment as opposed to forfeiture, which usually I

9  believe --

10         THE COURT:  I have $7,080 seized, but on the motion

11 for restitution -- let me just see that.  There is a

12 supplemental motion which is there, and there is an invoice.

13 So would -- the restitution would be made to Mr. Woodward, the

14 father of the victim?

15         MS. COLLINS:  Yes, Your Honor.

16         THE COURT:  Okay.  $900 I think it said.  All right.

17 Very good.

18         MS. COLLINS:  Thank you, Your Honor.

19         THE COURT:  Ms. Fitzgibbons.  Ms. Fitzgibbons.

20         MS. FITZGIBBONS:  Thank you, Your Honor.

21     Your Honor, we are also joined in the courtroom by

22 members of Mr. Keys' family, including his mother, brother, and

23 family friends.

24     Your Honor, I am asking that the Court accept the

25 parties' "c" plea recommendation of ten to 12 years, and I will

1  start with the nature and circumstances of the offense and then

2  speak to the issue of how the time should run.

3  Undoubtedly, this is a serious offense.  I don't want it

4  to be lost on the Court that this was an indirect drug

5  distribution, and I mentioned this in my sentencing memorandum

6  and it's in the statement of facts, it's not contradicted, but

7  Mr. Keys distributed to Individual A, who is not charged in

8  this case, and then that individual provided these drugs to the

9  victim.  They -- both these individuals used, and, tragically,

10  the victim passed away and Individual A did not.

11  I think of these cases as almost like cases of Russian

12  roulette.  It's like handing, you know, a gun with one round in

13  the chamber to someone who is an addict, and, unfortunately,

14  and very, very tragically and sadly for this family, their

15  loved one was lost.  Mr. Keys is remorseful for what happened.

16  And I provided the sentencing ranges in the defendant's

17  sentencing memorandum just to give the Court an idea of where

18  this district sentences in these type of offenses.  So to give

19  the Court some idea that the parties' range is consistent with

20  other sentences for similarly situated --

21  THE COURT:  I don't know that I have had a sale of

22  drugs resulting in the death of a victim, though.

23  MS. FITZGIBBONS:  I'm sorry, Your Honor?

24  THE COURT:  I don't know that -- I can't recall in

25  all my time in sentencing for drug distribution type offenses

1  that the victim has died.  This is a somewhat startling and

2  stark, if you will, factual difference between this case and

3  many others.  If there is any equity in all of this, it's that

4  there is a lot of time added at the state level already, but to

5  say that this sentence compares with other distribution type

6  cases is really not a very persuasive argument.

7          MS. FITZGIBBONS:  And I agree with the government

8  that it's, you know, it's very difficult to compare one case to

9  another, but of the cases that I have listed, several of these

10 involved sale for money.  They weren't just --

11          THE COURT:  But not deaths?

12          MS. FITZGIBBONS:  They all involved death, Your

13 Honor.

14          THE COURT:  They did?

15          MS. FITZGIBBONS:  Yes.  Yes.  Every one of them, or I

16 wouldn't have represented that to the Court.

17          THE COURT:  All right.

18          MS. FITZGIBBONS:  But, again, I agree with Your

19 Honor, I agree with Ms. Collins, there are no exact matches.

20 They are there to give the Court an idea that we are in the

21 right ballpark when we are asking the Court to accept the "c"

22 plea range that we have proposed.

23      With respect to how the Court should run the sentence

24 with respect to the undischarged state time, which is about 13

25 and a half years, and if all that time were to run, he would be

1   released from that sentence in 2033 -- from those sentences in

2   2033.  And, ordinarily, we wouldn't be having this conversation

3   if the cases were unrelated.  Factually, these cases are

4   unrelated.

5         My issue, as I laid out in the sentencing memorandum, is

6   the Court has discretion in cases like this for circumstances

7   like this.  There is flexibility where -- the Assistant State's

8   Attorney used this case in the state sentencing as an

9   aggravating factor, and Mr. Keys received the maximum penalty

10  in that case.  Ten years was the top of his state guidelines in

11  that case.  The Assistant State's Attorney argued to the judge

12  that he should consider this case, gave Judge Stanalonis the

13  police report in this case, gave the judge photos from the

14  phone in this -- in this case.  So I agree, maybe ordinarily

15  it's perfectly appropriate to run separate cases consecutively,

16  but this is not on all fours with that situation, and so that's

17  why I am making that request of the Court.

18        I think the other piece of this -- yeah.  I'm sorry, Your

19  Honor.  Did you -- I thought I heard...

20        The other piece of this is when we negotiated this plea

21  agreement, it was not clear what was going to happen in that

22  state case.  When I started with Mr. Keys, it was a misdemeanor

23  firearms offense, and then he elected to go to trial which then

24  increased the seriousness of the -- of the charges.

25        The fact of the federal detainer, obviously, the cases

1   impact each other in other ways, one of which being I thought

2   Mr. Keys and Judge Stanalonis had a very productive

3   conversation at his sentencing about the possibility that he

4   would go to a DOC facility that specialized in providing mental

5   health treatment, that specialized in youthful offenders, and

6   Mr. Keys was receptive to doing that, but the federal detainer

7   prevented that from happening.  So, for all of those reasons,

8   this is a situation where it would be appropriate to consider a

9   concurrent or partially concurrent sentence.

10          And in making that determination, obviously, the Court

11   applies the 3553(a) factors, and I highlighted them in my memo

12   to the Court, but perhaps I think the most compelling of those

13   factors is Mr. Keys' age.  He will turn 26 here at the end of

14   the month.

15          And I fleshed out some of the information that he

16   provided to Probation, but you can see, and I know Your Honor

17   has taken the time to look at -- to look at that, but Mr. Keys

18   did not have a male role model growing up, and the one that he

19   had was abusive, was incarcerated, was absent, and that put his

20   mother in a very difficult position.  She's very hard working.

21   I am very happy that she was able to take a day off to be here,

22   but she works constantly, and she was trying to raise him as a

23   single mom, and as a result, they moved constantly.

24          And I know you are thinking to yourself, Well, what's the

25   big deal there?  But the big deal there was places where he

1  should have gotten help, things were missed, and these aren't

2  little things that were missed.  The fact that he has a hearing

3  impairment really wasn't identified until he was nine years

4  old, so going to the first four or five years of his

5  educational career, he couldn't hear, so he was not successful.

6         And then he came into his middle school years struggling

7  with that impairment, along with ADHD and some other mental

8  health issues that the school system tried to address, but by

9  fifth grade, he was woefully behind.  I gave the Court an idea

10  of some of his test scores, you know, being 12 years old and,

11  you know, reading at the level of a seven or an eight year old.

12  It -- school was not a place where he could be successful,

13  although he tried.

14         And one of the bright places in his education is really

15  the opportunities that he had to participate in sports and

16  athletics because I think that gave him some positive

17  reinforcement, but, unfortunately, failing in school, he's not

18  able to necessarily to do that with the consistency that he

19  needed to.

20         The school records also, in addition to the learning

21  disability and the hearing loss, also talks somewhat to his

22  substance abuse, testing positive for marijuana from the age of

23  11 or 12 and using alcohol, and I think, like I said, some of

24  this was, from a very early age, a lack of resources to pay the

25  type of attention that was needed to get him on track sooner.

1      And what I see that he's done that's positive, and I --

2   and I know the Court is not surprised by this because you see

3   this sometimes where an individual will have two or three prior

4   convictions but never have served a sentence, like, in the DOC

5   or in the BOP, and this is also a situation where when Mr. Keys

6   was sentenced in St. Mary's County, that this is his first

7   experience with the Department of Corrections.  The prior

8   sentence was served locally and then in the detention center.

9      And so what he's done -- although he is not at Patuxent

10  where I think he would be making more progress, he's at Western

11  Correctional Institution up in Cumberland -- he put his name

12  immediately on the G.E.D. list.  He's now enrolled in the

13  G.E.D. program, and I am hoping that he can test and do the

14  things that he needs to do so when he moves into BOP, he can

15  take advantage of the vocational programs we will ask the Court

16  to recommend.

17      So, we have talked about the fact that this is a

18  significant sentence regardless of how the Court runs it,

19  particularly in light of his age, and it's our expectation that

20  when he moves to the Bureau of Prisons, he'd be designated to a

21  medium facility, and we would ask that the Court recommend --

22          THE COURT:  Sorry.  Go ahead.

23          MS. FITZGIBBONS:  -- I would ask that the Court

24  recommend Petersburg and specify that he take part in the

25  carpentry program there; Beckley also has a carpentry

1    vocational program and carpentry and masonry; and then Hazelton

2    has a vocational program in welding that Mr. Keys would intend

3    to take advantage of.

4         And, finally, as the Court can see, Mr. Keys has

5    significant support in the community, not just his mother, but

6    also his mentor that I discussed in my sentencing memorandum,

7    and he's been a little far from them in Cumberland, but it's my

8    hope that they can continue, and they will, I know they will --

9         THE COURT:  Sorry.  Are you recommending Petersburg

10   or Cumberland?  I am not sure what you are saying.

11        MS. FITZGIBBONS:  He is at Cumberland now, Your

12   Honor.  I am recommending Petersburg for -- for the federal

13   sentence and then Beckley in West Virginia and then Hazelton,

14   which is also in West Virginia, and all three of those have

15   vocational programs, that we would ask the Court recommend that

16   he participate in vocational programming at those facilities.

17        THE COURT:  Okay.  Anything else?

18        MS. FITZGIBBONS:  No, Your Honor.

19        THE COURT:  Mr. Keys, do you want to address the

20   Court?  I assume you have had an opportunity to talk to judges

21   before.  Here is your opportunity before this judge.

22        THE DEFENDANT:  Yes, sir.  I wrote a letter.  I am

23   going to let my lawyer read it for you all if that's okay?

24        THE COURT:  All right.

25        THE DEFENDANT:  Thank you.

1          MS. FITZGIBBONS:  Thank you, Your Honor.

2          First thing, I want to express my condolences for the

3     family that was impacted by my actions.  My intentions were

4     never to see someone die.  It took me a long time to understand

5     and accept how what I did was wrong.  I now understand that

6     addiction is a powerful thing.  You can be a victim of it.  By

7     selling, I was providing a temptation, and I realize how wrong

8     that is.

9          I have been trying to choose the right road both for my

10    safety and the safety of others.  I accepted responsibility for

11    the -- I accept and accepted responsibility for the

12    consequences of my actions.  I don't want this to define who I

13    am.

14          THE COURT:  Is that it?  Anything further from

15    Mr. Keys?

16          MS. FITZGIBBONS:  No, sir.

17          (It is the policy of this court that every guilty plea

18    and sentencing proceeding include a bench conference concerning

19    whether the defendant is or is not cooperating.)

20          THE COURT:  Some of this has been by way of

21    explanation to both families, the victim and the perpetrator.

22    This is a plea agreement where the government and the

23    defendant, through defense counsel, have negotiated a sentence

24    in this case, and not just one where there is an admission of

25    guilt, but really a binding range on the Court as to what the

1   outcome should be.

2       These are unusual, and I think both counsel know that I

3   am not a great fan of what are called binding plea agreements.

4   I usually like to have completely unfettered control over the

5   decision that I make in a case.  But I understand that the way

6   the criminal justice system works in this country, that in

7   order to avoid complicated trials and put -- putting families

8   through trauma and so on, it's important to allow these -- this

9   plea agreement process to go forward, and that's what happened

10  in this case.

11      And counsel have agreed between themselves, in

12  consultation with the defendant and I suspect the families,

13  that this range of sentence, which could be as high as 144

14  months but not higher in this case, would be acceptable.  Could

15  be lower according to the range as well.  It could be 120

16  months, I suppose.  But in any event, the Court would be bound

17  by the -- that sentence.

18      And I did talk to counsel on the phone before we came

19  here to be sure that it was the kind of plea that I was

20  prepared to accept, and I did indicate on the phone back

21  several months ago that I would accept.  And I don't usually

22  take more than three or four of these a year, and, otherwise, I

23  don't accept them because when you look -- that's sort of part

24  one of what I want to say.

25      The other part in terms of sentencing is that it used to

1  be that a judge was completely unfettered in terms of what a

2  sentence ought to be, all the way up to the statutory maximum

3  that was allowed in a case, so that in a case like this with

4  regard to, let's say, the distribution count, the statutory

5  provision would have allowed for 20 years on Count One and two

6  more years -- sorry, up to ten years more as to Count Two.

7  That would have been 30 years that the Court, under the

8  statutory guidelines, could have given this defendant.  That's

9  not, obviously, what he is going to get because that's not what

10 the parties have agreed to.

11        But the problem with the fact that judges were unfettered

12 with regard to the sentencing guidelines is that judges were

13 all over the place in similar cases all over the country, and

14 even within the same court, people who were similarly situated

15 would get sentences that were wildly disparate.  And so the

16 concept came in of sentencing guidelines where Congress,

17 particularly at the federal level, set up a Sentencing

18 Commission composed of judges, lawyers, academics, and others

19 that would try and evaluate different kinds of crimes,

20 different kinds of aggravating and mitigating factors with

21 regard to a particular defendant, the nature of the crime, and

22 come up with a range of sentence that they felt was more

23 plausible, and it would be more or less uniformly applied

24 across the country.

25        That was the idea of the sentencing guidelines.  In fact,

1   they were mandatory at one point, and judges such as me had to

2   apply them unless I could find a very good reason not to.  Now

3   I have to take them into account, but I am not bound by them.

4         So that's really the idea when you put together, first of

5   all, the need and the propriety of negotiating pleas, and then

6   the idea that there is a sentencing guideline range that talks

7   about a case, that's what the judge gets delivered to him or

8   her at the outset before I even touch the case.

9         So, here, frankly, the guideline range was not only 144

10  months -- up to 144 months from 120 in Count One, but an

11  additional 120 months that could have been added to that under

12  the guidelines.  There could have been another ten years in

13  effect added to the maximum under Count One.  So that's what

14  you get, and you put those two together and then you get this

15  recommended.

16        In this case, they are asking the Court to bind itself.

17  And in asking the Court to bind itself, what the counsel are,

18  in fact, saying is we think we can wrap this case up with a lot

19  less travail for everybody else if you will -- the defendant is

20  willing to take this sentence, if you are willing to accept it.

21  So that's the context in which I get this case.

22        Do I think that the defendant is a -- a bad actor in a

23  serious way?  You will hear me say, Of course he is.  There is

24  no question about that.  And I will say more about that in

25  specific detail.

1        The question really is, with regard to the sentence that
2   I impose, is that going to be commensurate with who this person
3   is?  And not just who this person is, I want to be very
4   emphatic about this, this is not a sentencing that deals just
5   with the defendant.  This is a sentencing that deals with the
6   defendant's family, and, frankly, for me, more importantly, the
7   victim's family.

8        So when you hear a lot of pleas -- and counsel for the
9   defendant does a good job arguing on behalf of him and why he
10  should be treated in a special way -- he's only one part of the
11  equation for me.  He is not the only person on trial, if you
12  will, right now, and that's a very important way in which I
13  visit -- envision sentencing.

14       And so I look at the sentencing factors, and there are --
15  under the statutes, 18, United States Code, Section 3553, there
16  are a number of factors that the Court is supposed to look at
17  now.  And bear in mind I have got a maximum of 144 months per
18  the agreement with the parties that I said I would bind myself
19  to.  The question is:  Is that reasonable?  Should it be less
20  than the 144?

21       Well, here are the factors that the Court looks at in
22  connection with a sentence like this.  First, what is the
23  seriousness of the offense?  Well, this is an offense where a
24  deadly drug was sold by somebody that resulted just immediately
25  in the death of the victim.  Now, whether the victim should

1   have been using drugs, probably not.  There is no -- not much

2   to say for that, but the victim did not buy into his own death.

3   And this is a serious epidemic, really, where fentanyl has been

4   responsible for deaths not just in this case.

5       So there is a huge responsibility on the part of those

6   who would deal with this drug, who would sell it to be deemed

7   accountable for what they have done, for the deaths that they

8   have caused.  This is not a -- a straightforward drug

9   distribution case, a straightforward gun case.

10      And even the cases cited by Ms. Fitzgibbons that were all

11  death cases which show sentences of five years, six years,

12  seven years, I can't accept those cases in any way bearing on

13  this case.  I can't imagine what the facts were where a judge

14  would give five years to somebody who sold a drug and the

15  person immediately died.  That can't be those cases, and if

16  they were, I radically disagree with any judge who would have

17  said that.  I think they didn't.  But in any event, that's the

18  way I deal with this.  This is a very serious case, serious

19  from the standpoint of the victim's family, serious from the

20  standpoint of the community.  A terrible problem.

21      And then I look next at the situation of the defendant; I

22  need to promote respect for the law; and there is a punishment

23  element as well.

24      Look at this defendant, 25 years old, about to be 26.

25  What a record for somebody 26.  I hear all these deprivations

1  that he claims, whether they are physical, emotional, or

2  otherwise, and somehow, that is meant to suggest that I ought

3  to be merciful.

4      Well, my job is to, number one, it seems me to, protect

5  the community from the likes of the defendant.  That's you,

6  Mr. Keys.  I don't know what you are capable of.  At 25, you

7  have run up a record here which is terrible, period.  No more

8  needs to be said about that.  You are committing crimes from

9  the time you are 11, from what I see, and you are just in and

10 out of system -- the system.  And sometimes you are punished,

11 sometimes you get a sentence that goes forward -- rather, a

12 prosecution that goes forward and too much, you have a

13 prosecution that never goes forward, and here you are and you

14 are committing crimes when you are on some sort of probation or

15 supervised release for committing crimes.  I mean, there is

16 just no end to what you have done.

17     To stand up now and say, verbally or in writing, I'm

18 sorry doesn't cut it.  It doesn't make it.  You have got a

19 lifetime, I mean a long time to consider whether you are -- you

20 merit any particular compassion because you don't with me.  You

21 don't.  I want that very clear.  I am speaking for the

22 community now.  I worry about you being out and about.

23     And I worry about young men who sell fentanyl, and I

24 worry about young men who are in and out of the criminal system

25 before they are 25 and there is a long record ahead of them.

 1   And then to hear simply that there are issues in their

 2   background, I regret that there are, and to the extent that

 3   there can be accommodation for someone like you when you are in

 4   custody, whether it's mental health or drug testing or

 5   whatever, fine.

 6        First and foremost, you have created a danger to the

 7   community.  First and foremost, you have basically devastated a

 8   family.  And I have read the reports, the statements of each of

 9   the father, sister, and brother who spoke before they spoke

10   today, so you hear that.  So this is why this case is not just

11   about you, Mr. Keys.  It's about them.  It's about other

12   communities who would be affected by what you have done.

13        So there is that issue not only of deterring you but of

14   deterring others who would be like you who did what you do.

15   The main thing, get you out of circulation.  And whether we

16   call it punishment or not, in some ways, it's academic because

17   you are going to be out of circulation for a considerable

18   period of time.  And to the extent that we can accommodate,

19   while you are in custody, your needs, mental health, emotional,

20   or otherwise, fine, we will do so.  But mainly it's to, it

21   seems to me, to deter you and recognize the seriousness of the

22   offense and deter others.

23        So my sentence for Count One should be one that you could

24   understand rather clearly.  I sentence you to 144 months, and

25   that will be consecutive to any sentence that you are currently

1    serving as imposed by the Circuit Court for St. Mary's County.

2    And I might say when I consider the fact that you have a

3    13-and-a-half-year sentence from the Circuit Court for

4    St. Mary's County, if all those years are, in fact, served, and

5    add them to the 144 months that I am serving, then we are

6    getting up into the range, frankly, the guideline range that

7    would be right for you anyway notwithstanding the fact that the

8    Court accepted the binding plea.  There is still a lot of time

9    for you to serve both in the state system and the federal.

10         So it's clear that the 144 months for Count One and then

11   the 120 months concurrent in this system, but consecutive to

12   anything in the state system, will give you the substantial

13   sentence that you deserve.

14         I will put you on supervised release for a period of

15   three years as to Count One and then consecutive -- sorry,

16   concurrent as to Count Two on supervised release.  And there

17   will be terms and conditions of supervised release which I will

18   go over with you in a moment.

19         There is a special assessment of $200 due and payable at

20   this time.

21         There is a restitution of $12,458 due and payable to

22   William Woodward, and that will be paid, I will recommend, in

23   full immediately insofar as cash assets were seized from the

24   defendant.

25         Now, Ms. Collins, that's something you will have to take

1    up with the -- your restitution bureau, whatever it's called,

2    in your department, but that's what the Court is ordering.  And

3    then thereafter, 50 percent of any wages you earn while in the

4    prison system would be applied to whatever are due and payable

5    at this time.  The due and payable would be out of assets that

6    you have, and if that's not sufficient, and it looks like it

7    won't be -- I think there was some $7,000, plus or minus, that

8    was seized.  It's a little more than 12,000 -- almost $12,500

9    ordered in restitution.

10        And then there is a forfeiture provision that the Court

11   has been asked to sign.  I don't think there was a preliminary

12   order in this case.  But the forfeiture order was the money

13   assets, the $7,080.

14        There were as well I think a weapon of some sort,

15   Ms. Collins.  I am looking at this now.  I don't see a weapon

16   mentioned in the preliminary order of forfeiture.  I have the

17   money assets -- money assets and property.  It says there were

18   some other subject property seized during the search at the

19   defendant's residence.  I don't see what they are -- where they

20   were -- it was a gun or more?

21            MS. FITZGIBBONS:  It's listed in paragraph 13 of the

22   plea agreement, Your Honor.  There is specific --

23            THE COURT:  Oh, it's in the plea agreement.  All

24   right.  Oh, it's not in the -- all right.  It's in the plea

25   agreement.  I will have to look at that for a moment.  It's not

1    in the forfeiture order, which, for the record, looking at the

2    plea agreement just at paragraph 13 -- all right.  $7,080.

3    There was also a firearm and ammunition forfeit to the Bureau

4    of Alcohol, Tobacco, Firearms & Explosives on or about August

5    13, 2021, one Polymer 80 Model PF940C 9 millimeter handgun and

6    a 30-round magazine contained therein, and then 35 rounds of 9

7    millimeter ammunition that would also be forfeit.

8         I don't know whether -- I have the preliminary order of

9    forfeiture, Ms. Collins.  I don't have those recited in the

10   order.  If there is a final order of forfeiture that were to

11   contain that language, I would be prepared to sign it.

12        MS. COLLINS:  So, Your Honor, just to clarify, the

13   reason those are not included is that they were

14   administratively forfeited, so they don't need to be included

15   in the Court's forfeiture order because that was done through

16   the administrative process.

17        THE COURT:  Very well.  The point is the Court now,

18   to the extent that they have not needed to be formally ordered

19   forfeit, the Court does so now.

20        MS. COLLINS:  Thank you.

21        THE COURT:  However it goes forward administratively,

22   that's another matter.

23        The Court imposes no fine in the case.

24        The forfeiture, I have spoken about.

25        The restitution, I have spoken about.

1        And then I want to be clear again that the payment of the

2   funds to the victim's family should be in full immediately

3   insofar as cash assets were seized from the defendant, and then

4   50 percent of any wages earned in accordance with BOP Financial

5   Responsibility Program.

6        Now, with regard to the -- the Court, with regard to the

7   sentence, will direct that the defendant be designated to FCI

8   Petersburg or Beckley or Hazelton.

9        Now let me go over the conditions of supervised release.

10  There are mandatory conditions, first of all, and this is

11  directed to you, Mr. Keys, so that you know.

12        You shall not commit any other crime, federal, state, or

13  local.  I guess I need to repeat that to you because I don't

14  think you got the message last time you probably were told by

15  another judge:  No crimes while you are on supervised release.

16  And there you went and did it.  I am telling you again, and if

17  you are ever -- I don't know whether you will be back before

18  the Court in my time, but whatever judge may see you in future,

19  you will be reminded emphatically if that's what you do once

20  you are out.

21        You must not unlawfully possess a controlled substance.

22        You must refrain from any unlawful use of a controlled

23  substance and submit to an appropriate drug test within 15 days

24  of release from prison; make restitution as indicated in

25  accordance with what I have ordered earlier; cooperation in the

1   collection of DNA as directed by your probation officer.

2       The standard conditions of supervision are that you

3   report to your probation officer as directed and that you

4   answer the questions truthfully that are put to you.

5       You must report to your probation officer within 72 hours

6   of your release from prison, and you will be told where to

7   report.

8       Any instructions that you get from your probation officer

9   must be followed by you.

10      You must not knowingly leave this district, that is,

11  Maryland, where you are authorized to reside without first

12  getting permission of the Court or Probation.

13      Again, as I have said, you have to truthfully answer

14  questions put to you by Probation, live in a place approved by

15  Probation, and you have to get the permission of Probation to

16  change your address at least ten days in advance.

17      You have to allow Probation to visit you wherever you may

18  reside and seize any items that are in plain view that are

19  there that are contraband.

20      You must, to the extent possible, attempt to work full

21  time and so on.

22      You must not communicate or interact with anyone you know

23  who is engaged in criminal activity.  And if you know someone

24  has been convicted of a felony, you must not knowingly

25  communicate with that person unless you have obtained approval

1   from your probation officer.

2        If you happen to be arrested or questioned by a law

3   enforcement officer, you have to notify that officer within 72

4   hours.

5        This is an item which, again, bears repeating three

6   times.  I will say it once, but it's important:  You must not

7   own, possess, or have access to any firearm, ammunition,

8   destructive device, or other dangerous weapon.  That's it,

9   period.  No ifs, ands, and buts.

10        You must not make any agreement with an enforcement

11   agency to act as a confidential human source or informant

12   without first getting permission of the Court.

13        And if it's determined that you pose a risk to any other

14   person or organization, the probation officer may require you

15   to advise that person of the risk and can then follow up to

16   make sure you have done so.

17        And, of course, as always, you follow the instructions of

18   the probation officer as to the conditions of supervision.

19        Now, there are a few special conditions of supervision

20   that are added to that.  Among the special conditions are,

21   first of all, that you pay the special assessment that has been

22   made earlier of the $200.

23        You must participate in a mental health treatment program

24   and follow the rules and regulations of that program.  I am

25   recommending mental health treatment while you are also in

1  custody.  You must also take any mental health medications as

2  appropriate.

3       There should also be substance abuse testing to see if

4  you have used a substance abuse -- a substance of any sort

5  that's prohibited, and then participate in a treatment program

6  to that extent possible.

7       Ms. Fitzgibbons, I think you asked that the defendant

8  also, when he is in custody, participate in a vocational

9  program, which I will also order to the extent that I can

10  recommend anyway to the Bureau of Prisons that he do so.

11      Beyond that, I think that covers all issues of the

12  sentencing except to notify you that, although I think there

13  probably was a waiver -- I don't have the plea agreement in

14  front of me -- you have the right to appeal, but to the extent

15  that you feel there is any appealable issue, you have 14 days

16  to notice your appeal.  Ms. Fitzgibbons can tell you more about

17  that.

18      Anything more from the government, Ms. Collins?

19           MS. COLLINS:  No, Your Honor.

20           THE COURT:  Ms. Fitzgibbons, anything more from you?

21           MS. FITZGIBBONS:  No, Your Honor.  Thank you.

22           THE COURT:  All right, Mr. Keys.  A long time to

23  think about it.  All right.  Thank you.  We are in recess.

24      (The proceedings were concluded at 3:42 p.m.)

25

1                    C E R T I F I C A T E

2

3              I, Renee A. Ewing, an Official Court Reporter

4    for the United States District Court for the District of

5    Maryland, do hereby certify that the foregoing is a true and

6    correct transcript of the stenographically reported proceedings

7    taken on the date and time previously stated in the above

8    matter; that the testimony of witnesses and statements of the

9    parties were correctly recorded in machine shorthand by me and

10   thereafter transcribed under my supervision with computer-aided

11   transcription to the best of my ability; and that I am neither

12   of counsel nor kin to any party in said action, nor interested

13   in the outcome thereof.

14

15                    Renee A  Ewing

16

17                    Renee A. Ewing, RPR, RMR, CRR
                      Official Court Reporter
18                    January 30, 2023

19

20

21

22

23

24

25